UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| AUTO OWNERS INSURANCE CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19 CV 66 ACL |
| | ) | |
| BLAIR LEASING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

In this action, Plaintiff Auto Owners Insurance Company requests a declaration of

no coverage against Defendant Blair Leasing, LLC, for a claim involving damage to eight

roofs following severe weather events in 2016. This matter is before the Court on

Defendant's motions to exclude testimony of John Lavin (Doc. 36), John Karnes (Doc.

38), and Charles Powell (Doc. 40); Defendant's Motion for Partial Summary Judgment

(Doc. 74); as well as Plaintiff's Motions for Summary Judgment (Doc. 44) and to Strike

(Doc. 83).

## I.      Factual Background

Plaintiff provided commercial property insurance for Defendant Blair Leasing.

### A.      The Insured Property

The insured property ("Property") consists of eight buildings that are joined

together on Independence Street in Cape Girardeau, Missouri. Five of the buildings

(Buildings A, B, C, D, and E) are covered by modified bitumen roofing material; one

building (Building F) is covered by a single-ply EPDM roofing material; and two

1

(Buildings G and H) are covered by metal roofing material.  When Defendant bought the Property, a "Blight Study" was performed and noted the roofs and ceilings of the Property needed repair.  Defendant asserts that it completed the repairs by April 1, 2011, and brought the Property to at least the condition required by the City of Cape Girardeau.

Before insuring the Property, Plaintiff inspected the Property to determine potential risk, coverage amounts, and premium amounts.  This inspection took place on May 21, 2014 and resulted in completion of a Field Survey Form, wherein Auto-Owners rated the "Overall quality of risk" as "Fair;" the "Building Condition" as "Average;" and the "Overall Roof Condition" as "Average."  The Form noted that the flat roof of the original building had been replaced in 2010 and stated that the roof "appears to be free from damage due to ice/snow accumulation and debris," and the "Effective Roof Remaining Useful Life" was "Over 11 years."  The commercial insurance policy was issued April 14, 2014 ("Policy").  Following a reinspection by Plaintiff, the Policy was renewed on April 15, 2016.

## I.B.    The Policy

The parties' insurance contract states that Plaintiff would "pay for direct physical loss of or damage to the Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  "Covered Causes of Loss" means "direct physical loss" unless the loss is excluded by the contract's "Exclusions" or limited by the contract's "Limitations."

Relevant portions of the Policy are set out below:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM**

2

**A.     COVERAGE**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations <u>caused by or resulting from any Covered Cause of Loss</u>.

(Doc. 46-1 at p. 1; emphasis added.)

## CAUSES OF LOSS – SPECIAL FORM

**A.     COVERED CAUSES OF LOSS**

When Special is shown in the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:

1.     Excluded in Section B., Exclusions; or
2.     Limited in Section C., Limitations

**B.     EXCLUSIONS**

1.     We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

      h.     "Fungi," Wet Rot or Dry Rot

      Presence, growth, proliferation, spread or any activity of "fungi", wet rot, or dry rot. However, if "fungi," wet rot or dry rot results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss":

      This exclusion does not apply:

            1.     When "fungi", wet rot or dry rot results from fire or lightning; or

            2.     To the extent that coverage is provided in the Additional Coverage – Limited Coverage for "Fungi", Wet Rot or Dry Rot with respect to loss or damage by a cause of loss other than fire or lightning.

2.      We will not pay for loss or damage caused directly or indirectly by any of the following:

d.      (1) Wear and tear;
(2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;…
(4) Settling, cracking, shrinking or expansion;

f.      Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor that occurs over a period of 14 days or more.

k.      Collapse, including any of the following conditions of property or any part of the property:

(1) An abrupt falling down or caving in;
(2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or
(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

However, if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, k., does not apply:
(a) to the extent that coverage is provided under the Additional Coverage, Collapse; or

(b) to collapse caused by one or more of the following:
1)the "specified causes of loss";
2)Breakage of building glass;
3)Weight of rein [*sic*] that collects on a roof; or
4)Weight of people or personal property.

m.      Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

3.	We will not pay for loss or damage caused by or resulting from any of the following, 3.a.through 3.c. But if an excluded cause of loss that is listed in 3.a.through 3.c.results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

   c.	Faulty, inadequate or defective:

      (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

      (3) Materials used in repair, construction, renovation or remodeling; or

      (4) Maintenance of part or all of any property on or off the described premises

(Doc. 46-1 at pp. 77-80.)

## G.	DEFINITIONS

2.	"Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   c.	Water damage means accidental discharge or leakage of water or steam, as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

(Doc. 46-1 at pp. 84-85.)

The insurance policy issued by Plaintiff includes a Section "D. Additional Coverage–Collapse" provision, which is separate and distinct from any exclusions to coverage specified by the Policy. That provision "applies only to an abrupt collapse," which means "an abrupt falling down or caving in of a building or any part of a building

with the result that the building or part of the building cannot be occupied for its intended purpose." (Doc. 46-1 at p. 82.) The "Additional Coverage—Collapse" provision further states:

> 2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building…if such collapse is caused by one or more of the following:
>
>> a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse.
>>
>> b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse.
>>
>> …
>>
>> d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused by…
>>
>>> (1) a cause of loss listed in 2.a. or 2.b;
>>> (2) one or more of the "specified causes of loss";
>>> (3) Breakage of building glass;
>>> (4) Weight of people or personal property; or
>>> (5) Weight of rain that collects on a roof.
>>
>> …
>
> 8. The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in D.1 through D.7.

***

*Id*. at pp. 82-83.

### I.C. Damage to the Property

Defendant claims damage to the roofs of its property resulted from wind and/or hail from three different storm events on April 26, 2016, July 6, 2016, and August 13,

2016.  Defendant maintains that the April 26, 2016 storm produced hail up to 1.25 inches in diameter accompanied by wind gusts up to 47 miles per hour, and the July 6 storm produced wind gusts up to 64 miles per hour as well as torrential downpours.  Then, a series of storms moved over the property beginning on August 12, 2016, which produced a total rainfall amount of 3.57 inches between 1:15 p.m. on August 12 and 2:38 a.m. on August 13.  Rain continued to fall after Blair Leasing's roof collapsed, and the rain amount totaled 7.91 inches between 6:00 a.m. on August 13, 2016, and 6:00 a.m. on August 14, 2016.

During the late-night hours of August 12 or the early morning hours of August 13, 2016, a portion of Building A's modified bitumen roof collapsed.  In addition to the collapse, these storms caused damage to other areas of Building A's roof as well as to the roofs of Buildings B, C, D, E, F, G, and H.  Defendant claimed Plaintiff was responsible for an alleged $4,927,831.56 loss, which included damages to the interior of Defendant's building.

Plaintiff maintains that Defendant's roof was old, worn, deteriorated, and defective before the time of the storms and needed replacement long before Plaintiff insured the roof.  Plaintiff's defenses to coverage include the fact that there is no evidence of recent functional damage to any of the roofs that would have been caused by a sudden and accidental event such as wind, hail, or rain.  In addition, Plaintiff alleges the noted damage found on the roof, which might have led to the interior water leakage, was the result of improper methods of installing the modified bitumen roofing material; insufficient slope on the flat roofs; deterioration from many years of general weathering

7

and exposure to the sun; lack of regular maintenance; age; and problems with crimping tools on the eastern metal roof. Moreover, because the roof did not sustain damage from a Covered Cause of Loss, Plaintiff argues it does not cover any damages to the interior of the building or structure caused by rain, snow, sleet, ice, sand or dust, whether driven by wind or not.

Plaintiff thus filed this lawsuit seeking a declaration of no coverage pertaining to the alleged storm event losses.

## II. Motions to Exclude Testimony

Defendant has filed three motions to exclude the testimony of Plaintiff's experts.

### II.A. Legal Standard

To be admissible, Federal Rule of Evidence 702 requires the expert testimony (1) help the trier of fact determine facts at issue; (2) be based on sufficient facts or data; and (3) be the product of reliable principles and methods. In addition, the expert must have reliably applied those principles and methods to facts of the case. This Court must act as a "gatekeeper" in determining the admissibility of expert testimony and must "make a preliminary assessment of whether the proffered expert's methodology is both scientifically valid and applicable to the case." *Bland v. Verizon Wireless, (VAW) LLC*, 538 F.3d 893, 896 (8th Cir. 2007); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so

fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded. *Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929-30 (8th Cir. 2001).

Accordingly, questions of conflicting evidence must be left for the jury's determination, and a trial court should resolve doubts regarding an expert's testimony "in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc.,* 457 F.3d 748, 758 (8th Cir. 2006). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Kudabeck v. Kroger Co.,* 338 F.3d 856, 862 (8th Cir. 2003) (citing *Daubert,* 509 U.S. at 596).

### II.B.   John Lavin

John Lavin is a meteorologist.  Plaintiff retained Lavin to help the jury understand the evidence presented to it and determine whether Defendant actually suffered any direct damage to its property as a result of the storms.  Defendant moves to exclude Lavin's opinion arguing that he is unqualified and that his methods are unreliable.

First, Defendant argues that Lavin used storm data from a different and weaker storm cell than the actual storm that impacted the Defendant's Covered Property on April 26, 2016.  The storm Lavin analyzed for his opinions occurred at the Cape Girardeau Municipal Airport, not at the Covered Property, and the airport storm occurred nearly half an hour after the pertinent storm.  Furthermore, Lavin also testified that the storm he used at the airport was "less intense" than the pertinent storm.  Lavin used the storm data to opine on the size of the hail produced by the storm at the Property.  Although Defendant suggests that Lavin did not use data from the storm that actually passed over the Property, he did use data from the storm that impacted the Property between 4:31

p.m. and 4:45 p.m. for both his hail size and wind speed determinations. He compared that data to another similar storm in order to form a more accurate opinion as to what the surface winds would have been. Data for the storm over the Property itself included wind speeds occurring at 3,000 feet above the surface, which would have been stronger than wind speeds on the ground. Lavin therefore extrapolated from other data in order to achieve a more accurate estimate of actual surface winds at the Property. Plaintiff points out that Defendant's expert similarly extrapolated from other data in his report.

Defendant next claims that Lavin's methodology is flawed, because he states that 75% of the time the "MEHS" algorithm overestimates the surface hail size. Lavin relied on a peer reviewed study entitled "An Enhanced Hail Detection Algorithm for the WSR-88D." Defendant claims that the MEHS algorithm necessarily underestimate hail size 25% of the time, but Plaintiff argues that Defendant fails to consider the amount of times that hail actually matches what is estimated by these tools.

Defendant also faults Lavin for failing to consider various MEHS data points around the time the April 26 storm impacted the Property, and failed to extrapolate from the data points. Lavin explained that was unnecessary because the new weather radar technology updates continually such that information is available from exactly when the storm passed over the Property. The most intense part of the storm passed over the Property between 4:34-4:38 p.m. At 4:38 p.m., the MEHS algorithm determined the maximum hail size was 1.13 inches with a 79% probability of hail over 0.75 inches in diameter. In comparison, Defendant's expert used data from a mile northeast of the Property to determine hail size. This Court disagrees that Lavin's use of data from conditions at the Property during the storm are less reliable than Defendant's own

expert's use of data from elsewhere. This matter is ripe for cross examination but not exclusion.

Defendant also claims Lavin failed to consider dual-polarization data and other types of differential reflectivity and correlation coefficient data. But Lavin's testimony clearly identifies and discusses his consideration of the dual polarization data. Lavin further agrees with Defendant's expert that the dual-polarization data supports hail, but Lavin found the signal was much stronger northwest of the Property.

Defendant further asserts that Lavin's failure to include a discussion of a three body scatter spike ("TBSS") being present is an example of "failing to fill the analytical gap." Plaintiff explains that in fact Lavin's testimony is there was no TBSS present on the radar—an opinion he supports with a peer-reviewed article—and that Lavin and Defendant's expert just interpret the data differently. This is again not a subject for exclusion but for cross-examination.

Finally, Defendant suggests that Lavin is not qualified to testify as an expert in this case because he did not consider himself a meteorologist until August 2018. Lavin is a Certified Consulting Meteorologist (as is Defendant's expert), which is the highest certification a consulting meteorologist can obtain, and it requires peer vetting and testing. Lavin has ample experience in forecasting and meteorology. He served as a student volunteer at the National Weather Service in Topeka, Kansas while he was in college and then worked for AccuWeather preparing specialized forecasts and warnings for clients, including Class I railways, schools, manufacturing plants, and concert venues. He prepared such reports and warnings by analyzing radar, satellite, and surface data from in-house software using his meteorological expertise. He also examined and analyzed past weather information to determine how well their forecasts performed—for

example, how well a forecast had predicted snow or whether a tornado warning had been properly issued. Lavin has also instructed a course at the annual American Meteorological Society Meeting and served as a mentor with the private sector meteorology organization at the American Meteorological Society. Lavin began to train in the forensic meteorology department in early 2017, working with a mentor gathering data and working on cases. Until August 2017, he had worked on ten expert reports which were signed by another expert. Since then, he has written around 100 site-specific reports for both insurance claims and litigation. Lavin has almost ten years of experience preparing specialized forecasts and storm warning and three years' experience in forensic meteorology and preparation of expert reports.

Lavin is qualified to testify in this case, and his opinions—though of course subject to cross examination—are helpful to the jury in understanding the specialized evidence in this case. The motion to exclude Lavin's testimony will be denied.

**II.C. John Karnes**

John Karnes is a real estate appraiser hired by Plaintiff to inspect the Property and render an opinion on the condition of part of the roof and the flooring. Karnes inspected the Property on November 20, 2019. He offered a three-page report and opined the damages sustained by the Property resulted not from the severe and undisputed storms that occurred in April, July, and August 2016, but from a lack of regular maintenance. Defendant believes Karnes also intends to opine as to valuation or an appraisal of the Property. Defendant moves to exclude Karnes's opinions.

First, Defendant argues that Karnes did not use any testable procedure or methodology to arrive at his conclusions. Federal Rule of Evidence 702(c) states that an expert's opinion must be "the product of reliable principles and methods." Karnes's

"methodology" was "observation" of the Property and damage to it applied to his experience. Defendant suggests Karnes was not qualified through experience or otherwise to opine on this matter. Karnes has an extensive background in commercial construction and appraisal. He worked in construction for several years, has overseen numerous construction projects for commercial buildings, has supervised remodel of modified bitumen roofing, and installed a metal roof. He has extensive training and experience in real estate appraisal. Rule 702 only requires that an expert possess "knowledge, skill, experience, training or education" sufficient to "assist" the trier of fact, which is "satisfied where expert testimony advances the trier of fact's understanding to any degree." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006). This Court is satisfied that Karnes is qualified to opine on the condition of the Property.

Defendant adds, though, that Karnes could not have reliably assessed the condition of the property because he did not observe all of it. The Property has three different types of roofs (modified bitumen, metal roofing, and elastometric roofing), and Karnes physically observed only the modified bitumen roofing and saw just portions of the metal roofing from a distance. Defendant states Karnes testified that he could not recall whether he had observed portions of the elastometric roofing, but his deposition testimony appears to state he could not remember which part of the elastometric roofing he could see. Although Karnes was not able to access all the Property's roofs directly, he was able to make observations from where he stood on the modified bitumen roof. His opinion regarding the condition of the roof was informed by a number of observations: there was pooling on the concrete floor on the main level, and stains in other areas indicating more water had pooled on the floor. Water damage and rot was also observed on the upper level of the Property, and the modified bitumen roof had several sunken

13

areas and areas where cracks were noticeable in places where the roofing had been sealed during installation. Karnes also observed areas where the roof cover was disintegrating and peeling. Karnes's opinions are not without foundation, and Defendant's concerns are matters for cross-examination, not exclusion.

As for Karnes's opinions as to the valuation or appraisal of the Property, Plaintiff contends that Karnes's testimony will help the jury determine whether the Property suffered any loss in fair market value. Defendant argues that Karnes did not actually complete a market value appraisal of the property because, Karnes testified, it wasn't within the scope of the assignment. When asked whether he performed an appraisal compliant with uniform standards of professional appraisal practice ("USPAP"), he replied "I did not value the property at all." Yet Plaintiff suggests that Karnes will testify that the value of the Property is likely to be the same today as it was at the time Defendant purchased it. This Court agrees with Defendant that Karnes's testimony is not sufficiently reliable here. Karnes may have been qualified to do so, but he testified repeatedly that he did not complete a USPAP-compliant appraisal nor did he "value the property at all." As a result, this Court must exclude this aspect of any proffered testimony by Karnes.

The motion to exclude Karnes's testimony is thus denied in part and granted in part.

### II.D.   Charles Powell

Plaintiff hired Charles Powell, PE, HCI-R/C/W to render an opinion as to the condition of the roof and the Property and the cause of any damage to the roof. Mr. Powell performed two inspections of the Subject Property, one in March of 2017 and one in June of 2019. Powell is a Haag Certified Inspector for commercial property and also

has residential and wind certifications from Haag. Haag certification requires extensive coursework every five years. Powell also has experience performing forensic investigations on flat roofs, metal roofs, and modified bitumen roofs. He has performed forensic investigations on approximately one hundred modified bitumen roofs and approximately one hundred commercial metal roofs.

Powell performed two inspections at the Property—one each on March 15, 2017 and June 12, 2019. On March 15, 2017, he spent over two hours inspecting the Property and took approximately 500 photographs. He also met with a contractor and a representative of Defendant. To evaluate the cause of damage to the Property, Powell looked at evidence of hail impact, such as dents on soft metal and splatter marks on oxidized surfaces. He also looked for evidence of wind damage, such as objects knocked down and tearing or removal of the roofing membrane. Although Powell did not perform a leak trace to pinpoint where a leak penetrated the roof, he observed that the leakage was located in low areas with ponding water. He also explained that the presence or size of hailstones impacting a property can only be accurately determined by investigating the actual physical evidence on the property.

On June 12, 2019, Powell spent an hour and a half inspecting the Property and took 200 photographs. The inspection was limited to an area of roof collapse, but he also walked the roof to look at its condition generally. Powell generally conducts a visual inspection the soft metal on the roof because it is one of the first things damaged by hailstones. When he finds evidence of "massive damage to those soft metals…," then he "will take more time on a roof to look at it." (Doc. 46-4 at p. 56; deposition page 224.)

In addition to his visual inspection on March 15, 2017, Powell also analyzed two ten foot by ten foot test squares, one on the north side of the modified bitumen roof and

one toward the south side of that roof. He took photographs of the test squares. Powell also felt the surface of the roof for any dents, bruises, or tears to determine if there were any bruises caused by hailstones.

Powell's typical methodology is to perform a visual examination of a property, take photos, occasionally meet with the insured to discuss any damage or any potential causes, and to sometimes meet with the contractor or roofer to discuss any damages. He testified that he followed that methodology in forming his opinion for this case. He also relied on Haag Certification course books in Wind Damage, Residential Roofs, and Commercial Roofs. He also consulted weather records.

Defendant claims that Powell's methodology was insufficient for numerous reasons, including because he did not measure the slope of the roof to form his opinion that the roof's slope was insufficient. Powell explained that he determined the slope was insufficient by identifying the presence of standing water on the roof. Powell's testimony was not dependent on a particular measurement.

Defendant further argues that Powell's opinions regarding the weight of rainwater and its effect on the roof should be excluded as unreliable. Powell opined that one inch of rainwater would yield 5.2 pounds per square foot of weight, which is a nominal load for a roof structure that would have had very little effect on a wood roof structure in generally good condition. Powell's opinion is that many years of inadequate maintenance has resulted in years of rainwater leakage, which had rotted and weakened the roof support structure. Powell's hypothetical was related to the effect of water on a roof in good condition, which he concluded was not the case at the Property. Defendant criticizes Powell's analysis as an "afterthought" that does not take into account the weight of the roof, how saturated the roof was with rainwater already, or what type of

load the roof could carry structurally.  Defendant says testimony that a load of 1.3 pounds would have little effect on a wood roof in good condition is conclusory and misleading. This Court disagrees that the testimony should be excluded.  Powell's methodology in this case was consistent with his statement that roofs are generally designed to hold fifteen to twenty pounds per square foot.  Again, Defendant's concerns are best addressed through cross examination.

Defendant's motion to exclude Mr. Powell's testimony will be denied.


III.     **Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962).  Because "the interpretation and construction of insurance policies is a matter of law, ... such cases are particularly amenable to summary judgment." *John Deere Ins. Co. v. Shamrock Indus., Inc.*, 929 F.2d 413, 417 (8th Cir. 1991).

Because this is a diversity case, the Court applies state substantive law and federal procedural law.  *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).  Plaintiff's claim is based on a Missouri contract and an accident that occurred in Missouri.  The parties appear to agree that Missouri law controls.

### III.A.  Plaintiff's Motion for Summary Judgment

Plaintiff seeks summary judgment on its claim for a declaration of no coverage against Defendant for Defendant's roof damage claim.  Although Plaintiff appears to seek summary judgment with respect to all of the insured buildings, its arguments only directly address its coverage of Buildings A, B, C, D, E, and H—not for F (the sole building covered with a single-ply EPDM roofing material) or G (one of the two buildings covered by metal roofing).

The interpretation of an insurance policy is a matter of state law.  *St. Paul Fire & Marine Ins. Co. v. Schrum*, 149 F.3d 878, 880 (8th Cir. 1998).  In Missouri, interpretation of an insurance policy is a question of law.  *Schmitz v. Great Am. Assur. Co.*, 337 S.W.3d 700, 705 (Mo. *banc* 2011).  When construing the terms of an insurance policy in Missouri, a court applies the meaning that "would be attached by an ordinary person of average understanding if purchasing insurance," and resolves any ambiguities in the policy in favor of the insured.  *Marrs v. Am. Fam. Ins. Co.*, 522 S.W.3d 926, 928 (Mo. Ct. App. 2017).

### 1.    Direct Physical Loss

Plaintiff first argues that it is entitled to summary judgment because Defendant did not suffer a "direct physical loss," as required by the Policy.  The threshold requirement of a "direct physical loss" is met when an item of tangible property has been damaged by a peril like wind or hail.  10 *Couch on Insurance 3d*, § 148-46 at 148-80 (1998).  Here, Plaintiff argues that a "direct physical loss" did not occur because the evidence shows the Property's roofs were in need of replacement before the claimed storm damage occurred.

First, Plaintiff argues that Defendant's own professional engineering expert, Carl Martin, testified that the conditions present on the bitumen part of the roof in 2015 included accumulations of water and sediment on the roof. Those conditions, Plaintiff says, would require replacement of the roof. Martin opined that the conditions (pooling water and sediment) were the result of faulty construction of the roof. In addition, Martin testified that the metal roof part of the Property suffered from a defective installation that required replacement.

Plaintiff also asserts that Defendant had obtained estimates in 2015 for replacement or significant repair of the modified bitumen roof and metal roof from Todt Roofing and Cape Construction, respectively, due to water damage sustained in 2015. However, Plaintiff states that no repair work was actually performed by any contractor to fix the roofs. If the roof already needed to be replaced, Plaintiff argues, then the roofs' damage cannot be a direct physical loss from a "Covered Cause of Loss" under the Policy.

Defendant responds that Plaintiff does not cite to any specific provision that would exclude coverage for this particular issue, but, even if it did, there appears to be a disputed issue of fact about whether the roofs were so deteriorated as to require replacement. Defendant points out, for example, that Plaintiff's own records—its Field Survey Form from Plaintiff's May 21, 2014 inspection reflects that the flat roof was replaced when Defendant purchased the insured property in 2010. The Form stated the "[r]oof appears to be free from damage due to ice/snow accumulation and debris" and the "Effective Roof Remaining Useful Life" was "Over 11 years." Buildings A, B, C, D, and E have flat roofs, so Defendant suggests that this Form pertained to those roofs. Although Defendant notes that Plaintiff's Form says the roof was replaced in 2010,

Defendant also concedes that its expert Martin testified that the roofs could be 20 to 30 years old. Neither party explains this discrepancy.

Another issue with the parties' arguments is that neither party consistently identifies which roof or roofs it addresses. Defendant points out that Plaintiff does not even appear to move for summary judgment on the roofs for Buildings F and G, and Plaintiff does not clarify that issue in its reply brief. Moreover, Plaintiff's inspection forms for the Property do not clearly identify which roofs are at issue, although there are clues—like references to flat roofs—that provide some illumination.

Another inspection by Plaintiff was performed in March 2017. The written reported stated "the roof had a 20' by 30' section collapse and replaced within the last year. The remaining section, including the section replaced, appear to be in good condition. No part of the building was viewed as decaying or rotting." The roof was then estimated to have five to ten years of useful life remaining. With respect to the evidence that Defendant received estimates to repair the roof(s) in 2015 (again, it is not clear exactly which roof is at issue), Defendant offers evidence that it completed the necessary repair work itself.

Defendant also disputes the assertion that its expert's testimony about installation defects required replacement of the roof. Defendant's expert Martin testified that to repair the damage to Building H's 55-year-old metal roof, if one decided to repair it, would not necessarily require replacing the entire roof. Martin also testified that "in practicality it would be difficult, and most roofers would not want to do it because they would not be able to guarantee a leak-free seam." (Doc. 77-14 at 125.) Regardless, Defendant disputes that the alleged defects were problematic at all, as the roof had existed in that condition with no leaks for 55 years. As for the flat bitumen roof, Martin's

testimony was that the sediment collected on the roof was not unusual for flat roofs, and Plaintiff denies that replacement of the roof was required for this condition.

In light of these disputed facts, summary judgment is not warranted with respect to Plaintiff's "direct physical loss" argument.

### 2. Dry Rot and Wet Rot and the Additional Collapse Provision

Plaintiff next argues that the "dry rot" and "wet rot" exclusions in the Policy bar coverage for the damages associated with any collapse, including damages to the roof of Building A and interior damages. The contract stated at Causes of Loss – Special Form, Section B.1.h, that Plaintiff "will not pay for loss or damage caused directly or indirectly by Wet Rot or Dry Rot." Section B.1 states that "any such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."

Defendant asks the Court to stop here and look to the Policy's Additional Coverage—Collapse provision. Defendant argues the special Collapse coverage <u>does</u> allow for coverage in the event that rot causes the collapse, because Section D.2.a covers "collapse if caused by…building decay that is hidden from view." But, continuing to Section D.8: "The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in D.1 through D.7." And recall that, back in Section A, "Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is: 1. Excluded in Section B., Exclusion; or 2. Limited in Section C., Limitations."

Plaintiff therefore contends that the Collapse provision, as a Covered Cause of Loss, is <u>still subject</u> to the Exclusions, including the Exclusion for fungi, wet rot, or dry rot. That is, Plaintiff says, even though the Policy covers collapse in the event of "decay that is hidden from view," such decay caused by fungi, wet rot, or dry rot is excluded.

Plaintiff states that both its expert and defense expert Martin agree that the collapse of Building A's roof was caused by dry or wet rot resulting from standing water infiltrating the roof. Thus, Plaintiff insists that Defendant cannot recover for collapse of the roof under these circumstances, even in light of the additional coverage for Collapse.

Defendant insists that the decayed joists supporting the roof were hidden from view by insultation and that the Collapse coverage applies notwithstanding the wet and dry rot Exclusions. Defendant explains that Plaintiff's own witness testified that "decay" and "rot" are synonymous and interchangeable and, thus, the Policy is ambiguous if Defendant's decayed and collapsed roof is excluded from coverage.

Plaintiff concedes its witness so testified, but disagrees that decay and rot always mean the same thing. Citing the Merriam-Webster dictionary, Plaintiff notes

> Merriam-Webster defines "decay" in the following terms: "the product of decay"; "a wasting or wearing away." *See* Merriam-Webster, definition of decay, *available at* https://www.merriam-webster.com/dictionary/decay (last visited June 21, 2021). Furthermore, "wet rot" is defined by Merriam-Webster as "decay of timber by fungi that attack wood having high moisture content." *See* Merriam-Webster, definition of wet rot, *available at* https://www.merriam-webster.com/dictionary/wet%20rot (last visited June 21, 2021). "Dry rot" is defined as "a decay of seasoned timber caused by fungi that consume the cellulose of wood leaving a soft skeleton which is readily reduced to powder." *See* Merriam-Webster, definition of "dry rot", *available at* https://www.merriam-webster.com/dictionary/dry%20rot (last visited June 21, 2021).

(Doc. 79 at p. 6.) Plaintiff contends that those definitions prove "rot" and "decay" can be distinct, and it notes that some building materials could decay but are not susceptible to rot (e.g., brick, concrete).

As the term at issue is not defined within the Policy, the Court turns to a dictionary to ascertain its ordinary meaning. *See Doe Run Res. Corp. v. Am. Guarantee & Liab. Ins.*, 531 S.W.3d 508, 512 (Mo. *banc* 2017) ("When a policy does not define a

particular term, courts use the ordinary meaning of the word as set forth in the dictionary."). *Webster's Third New International Dictionary*[1] defines "decay" as "the condition of a person or thing that has undergone a decline in strength, soundness, or prosperity or has been diminished in degree of excellence or perfection." *Webster's Third New International Dictionary* 584 (2002). It alternatively defines "decay" as "the material process of dilapidation: wasting or wearing away." *Id*. It also offers the definition, "ROT; [specifically]: the aerobic decomposition of proteins chiefly by bacteria in which the products of putrefaction are completely oxidized to stable compounds having no foul odors." *Id*.

If the language of an insurance contract is clear and unambiguous, courts do not have the power to rewrite the contract for the parties and must construe the contract as written. *Crim v. National Life and Accident Ins. Co.*, 605 S.W.2d 73 (Mo. *banc* 1980). "If the policy is ambiguous, it will be construed against the insurer." *Id*. An ambiguity exists if there is "'duplicity, indistinctness, or uncertainty'" in the meaning of the policy language or if it is "'reasonably open to different constructions.'" *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. *banc* 2007) (quoting *Gulf Ins. Co. v. Noble Broadcast*, 936 S.W.2d 810, 814 (Mo. *banc* 1997)). "Definitions, exclusions, conditions and endorsements are necessary provisions in insurance policies. If they are clear and unambiguous within the context of the policy as a whole, they are enforceable." *Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 163 (Mo. *banc* 2007). It is the

---

[1] *Webster's Third New International* is the Missouri Supreme Court's "institutional dictionary of choice[.]" *AAA Laundry & Linen Supply Co. v. Dir. of Revenue*, 425 S.W.3d 126, 132 (Mo. *banc* 2014).

insured's burden to establish coverage and the insurer's burden to show that

an exclusion to coverage applies. *Manner v. Schiermeier*, 393 S.W.3d 58, 62-63 (Mo.

*banc* 2013).

The Court agrees with Defendant that the Policy is ambiguous. As noted above,

one of the definitions of "decay" in the *Webster's Third New International Dictionary* is

"rot." Although Missouri courts have not considered this issue, other courts have found

the term "decay" is ambiguous. *See, e.g. Stamm Theatres, Inc. v. Hartford Cas. Ins. Co.*,

93 Cal. App. 4th 531, 535, 113 Cal.Rptr.2d 300 (2001) (holding "decay" ambiguous,

thereby construing in favor of coverage, such that coverage for collapse due to "hidden

decay" included collapse caused by a "concealed process of gradual loss in the strength

of building materials"); *Easthampton Congregational Church v. Church Mut. Ins.*, 916

F.3d 86, 93 (1st Cir. 2019) ("decay" ambiguous when "could plausibly be read to mean

either 'progressive decline' or 'rot,'" thereby construing in favor of insured).

"When a policy specifically provides coverage for collapse, but excludes coverage

for damages caused by rot, the exclusion will normally only [preclude recovery for

noncollapse damage caused by the rot." 11 *Couch on Insurance 3d*, § 153:80 (1998). A

California appellate court considered a nearly identical issue in *Jordan v. Allstate Ins.

Co.*, 116 Cal App. 4th 1206, 1219-20, 11 Cal. Rptr. 3d 169, 179-80 (2d Dist. 2004). In

*Jordan*, the insured made a claim under an insurance policy for damage to her home

caused by a water-conducting fungus. The insurer denied coverage based on an

exclusion for wet or dry rot. The Court of Appeals, reversing summary judgment in

favor of the insurer, concluded that the use of the term "hidden decay" in the "additional

coverage" provision for collapse and the use of the term "wet or dry rot" in the exclusion

created an ambiguity with respect to coverage involving a claim of collapse. The court explained that the ambiguity could be resolved in either of two ways: (1) collapse due to "hidden decay" would be covered, but not if such decay was caused by "wet or dry rot"; or (2) collapse due to "hidden decay" would be covered, but *noncollapse* damage caused by "wet or dry rot" was excluded. While both interpretations were reasonable, the court resolved the ambiguity with the second interpretation, because it was consistent with the insured's objectively reasonable expectations.

This Court finds the reasoning of *Jordan* persuasive. A reasonable interpretation of the relevant Policy provisions is that wet or dry rot is excluded *except where its presence causes hidden decay leading to collapse*.

Plaintiff also argues that the Additional Coverage-Collapse does not apply here because there was no "abrupt" collapse. Citing the *Merriam-Webster* dictionary, Plaintiff notes that "abrupt" is defined as "characterized by or involving action or change without preparation or warning: sudden and unexpected." *See* Merriam-Webster, definition of "abrupt", *available at* https://www.merriam-webster.com/dictionary/dry%20rot (last visited June 21, 2021). Plaintiff contends that Defendant had warning that the roof could collapse, based on prior damage and ponding on the roof.

Defendant responds that the collapse of Building A's roof was abrupt, as the roof fell suddenly and without warning. Defendant cites to the testimony of Francis Bader—who provided building maintenance services on the property—that he did not notice any indication that the roof was going to cave in before it did cave in. (Doc. 75-4 at p. 7.)

Viewing the evidence in a light most favorable to Defendant, a reasonable jury could find that the building collapse was both sudden and unexpected. Mr. Bader testified that he merely noticed over the span of "a couple of days," water began leaking

into the interior of Building A and started to accumulate on the roof. (Doc. 75-4 at p. 5.)

A roof leaking over the course of several days following a series of heavy storms does

not amount to an expectation that part of the roof would collapse. *See Malbco Holdings,*

*LLC v. AMCO Ins. Co.,* 719 F.Supp.2d 1311, 1314-15 (D. Or. 2010) (despite slow

sagging of corner of hotel and gradual rot of building materials, reasonable jury could

find abrupt, sudden failure of corner of hotel). Accordingly, the Court overrules

Plaintiff's motion for summary judgment on this issue.

Defendant argues that it is entitled to partial summary judgment in that the

"Additional Coverage—Collapse" provision of the Policy provides coverage for damages

relating to the collapse of Building A's roof. Defendant has the burden of establishing

coverage under the Policy, and the uncontroverted facts before the court do not establish

either that the collapse was due to decay, that the decay was hidden in nature, or that the

collapse was abrupt. Plaintiff points to the testimony of Mr. Bader that he had been

pumping water off the roof in a low spot where it eventually collapsed for a couple of

days prior to the collapse. (Doc. 81-7 at p. 9.) Plaintiff contends that this testimony

establishes that the collapse of the roof was expected and not abrupt. The trier of fact

will determine whether the collapse was due to decay, whether the decay was hidden in

nature, and whether the collapse was abrupt. Thus, Defendant is not entitled to summary

judgment on this claim.

Finally, the Court notes that Defendant argues in a footnote that it also purchased

the "Additional Coverage – Limited Coverage for 'Fungi', Wet Rot or Dry Rot," which

alone precludes Plaintiff from excluding coverage based on the wet rot and dry rot

exclusion.  (Doc. 78 at p. 18.)  Plaintiff does not address that argument at all.  In the Exclusions section, the subsection on "Fungi", Wet Rot or Dry Rot states that the exclusion does not apply "To the extent that coverage is provided in the Additional Coverage – Limited Coverage for "Fungi", Wet Rot or Dry Rot with respect to loss or damage by a cause of loss other than fire or lightning."  The Additional Coverage for "Fungi", Wet Rot or Dry Rot provision states as follows:

E. ADDITIONAL COVERAGE – LIMITED COVERAGE FOR "FUNGI", WET ROT OR DRY ROT

1. The coverage described in E.2 and E.6 only applies when the "fungi", wet rot or dry rot is the result of a "specified cause of loss" other than fire or lightning that occurs during the policy term and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

2. We will pay for loss or damage by "fungi", wet rot or dry rot.  As used in this Limited Coverage, the term loss or damage means:

   a. Direct physical loss or damage to Covered Property caused by "fungi", wet rot or dry rot, including the cost of removal of the "fungi", wet rot or dry rot.

   b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet rot or dry rot; and

   c. The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet rot or dry rot are present.

3. The coverage described under E.2 of this Limited Coverage is limited to 10% of the building or personal property limit of insurance, whichever is greater, subject to a maximum of $100,000 and a minimum of $15,000.…

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property.  If a particular occurrence results in loss or damage by "fungi", wet rot or dry rot, and

27

other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungi", wet rot or dry rot, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungi", wet rot or dry rot causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

\*\*\*

6. The following, 6.a. or 6.b, applies only if Business Income and/or Extra Expense Coverage applies to the described premises….

(Doc. 46-1 at pp. 84-85.)  It is not clear whether Defendant claimed that the Additional Coverage – Limited Coverage for "Fungi", Wet Rot or Dry Rot was triggered during the policy period.  In consideration of the Court's finding that Plaintiff is not entitled to summary judgment under the "wet rot or dry rot" exclusion, the Court need not address this additional argument.

### 3.  Construction flaws

Next, Plaintiff, apparently referring to the roofs for Buildings A and H, contends that the Policy bars coverage for loss or damage due to faulty construction or workmanship.  Plaintiff points again to Defendant's expert, Martin, who testified that improper installation of the roof membrane had allowed the alleged wind damage to the roof to occur.  Martin also testified that the roof slope is inherently deflected because of its installation defects, and that the damage on the roof of Building H is from crimper operations during the installation of the roof.

Defendant responds, however, that the facts set forth by Plaintiff are refuted by Martin's other testimony.  As discussed above, Martin testified that the large, low sloping

roof on Building A saw an accumulation of water and sediment, which is "just a function of flat roofs." Further, he opined that the modified bitumen roof membrane laps on Building A were impacted by wind forces, which resulted in uplift and separation of the membrane laps, which caused moisture infiltration. With respect to the metal roof on Building H, Martin observed only "isolated" damage caused by the crimper operations at installation, and this damage was only visible in "some" areas. Thus, Defendant argues that Plaintiff's disputed facts are inappropriate for summary judgment.

Defendant further maintains that the Policy's exclusion does not apply here. The Policy's exclusions state that Plaintiff "will not pay for loss or damage caused by or resulting from" faulty or defective workmanship, construction, repair, or grading <u>unless</u> this excluded cause of loss "results in a Covered Cause of Loss," at which time Plaintiff "will pay for the loss or damage caused by that Covered Cause of Loss." A "Covered Cause of Loss means Risks of Direct Physical Loss" unless otherwise excluded. Here, wind and hail are covered causes of loss. Thus, Defendant responds that to the extent wind and/or hail damaged Buildings A and H, such damage to those buildings is covered despite the presence of any faulty or defective workmanship, construction, repair, or grading of any roof.

Plaintiff states in its memorandum that Defendant "could claim coverage for any damage that results from the excluded faulty workmanship if such were <u>caused</u> by a Covered Cause of Loss." (Doc. 45 at p. 15.) That is not the language of the Policy. The Policy states that "if an excluded cause of loss that is listed in 3.a.through 3.c. [faulty workmanship, etc.] <u>results</u> in a Covered Cause of Loss," then Plaintiff would pay.

This Court agrees with Defendant that this record does not support summary judgment in favor of Plaintiff.

### 4. "Wear and tear" exclusion

Plaintiff also argues that the "wear and tear" exclusion bars coverage for Defendant's claim with regard to the roofs of Buildings A, B, C, D, and E. In support, Plaintiff notes that defense expert Martin testified that the age of the roofs was more than 20 years old. He also testified that the service life of a roof of that type was 20 to 30 years and that he could not say to a reasonable degree of certainty whether roofs would have suffered damage if not for the prior deterioration. Plaintiff urges that whether the words "deterioration" or "wear and tear"—as used in the Policy's exclusion—includes a roof eclipsing its service life is a question of law for the Court to decide. *Moore v. Commercial Union Insurance Company*, 754 S.W.2d 16, 18 (Mo. Ct. App. 1988).

This Court must construe the policy as a whole and give the policy's language its plain and unambiguous meaning. *Columbia Mutual Insurance Company v. Schauf*, 967 S.W.2d 74, 77 (Mo. *banc* 1998). If the Court concludes that the policy's language is unambiguous, the Court must enforce the policy as written. *Gabriel v. Shelter Mutual Insurance Company*, 897 S.W.2d 119, 120 (Mo. Ct. App. 1995).

The definition of 'deteriorate' is 'to make inferior in quality or value,' 'to grow worse,' and 'become impaired in quality, state, or condition.'" *Matter of Spire Missouri Inc.*, 593 S.W.3d 546 (Mo. Ct. App. 2019), *reh'g and/or transfer denied* (Dec. 12, 2019), *transfer denied* (Mar. 17, 2020) (citing *In Matter of Verified Application & Petition of Liberty Energy (Midstates) Corp.*, 464 S.W.3d 520, 525 (Mo. *banc* 2015) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 616 (1993)).

Looking to the language of the Policy, as with the construction flaw exclusion, the wear and tear exclusion adds that "if an excluded cause of loss that is listed in 2.d.(1)

through (7) results in a 'specified cause of loss'…we will pay for the loss or damage caused by that 'specified cause of loss…'" (Doc. 46-1 at p 79.) Again, "windstorm or hail" is included within the Policy's definition of "specified cause of loss." It is of course logical that an insurance policy does not pay for a new roof for the mere reason that the roof has aged and deteriorated. But if wear and tear results in loss from wind and/or hail, then the policy provides coverage. To find otherwise would effectively bar coverage for anything other than a new roof.

Defendant's expert determined that the roofs were damaged by wind and/or hail, and such weather events have caused moisture infiltration of the roof, roof deck, and roof joists of Buildings A, B, C, D, and E. There is also a dispute regarding the amount of wear and tear present on the roofs. For example, Defendant highlights that Martin also testified that the deterioration on those roofs was minor. Further, Plaintiff's own records show that inspections estimated the flat roof had 5 to 10 years of remaining useful life.

In light of the evidence and the plain language of the Policy, this matter is not appropriate for summary judgment.

### III.B.  Defendant's Motion for Partial Summary Judgment

Defendant has moved for partial summary judgment for damages resulting from the collapse of the roof of Building A.  The undersigned has found that the uncontroverted facts do not establish beyond a reasonable doubt either that the collapse was due to decay, that the decay was hidden in nature, or that the collapse was abrupt. Thus, Defendant's Motion for Partial Summary Judgment will be denied.

## IV.    Plaintiff's Motion to Strike

Plaintiff seeks to strike two Material Facts set forth by Defendant in its Statement of Uncontroverted Material Facts in Support of its Motion for Partial Summary Judgment because Defendant relied upon expert reports to support such facts.  Plaintiff contends that the reports are hearsay and thus not admissible in evidence.

"To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e)." *DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 825-26 (8th Cir. 2009) (quoting *Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005)).  In *DG&G*, the Eighth Circuit held that the district court had not abused its discretion by permitting the movant to supplement the summary judgment record with an appropriate affidavit, thereby curing the hearsay problem.  *Id.*

Here, Defendant offers to cure by supplementing the citation to the relevant Material Facts.  Notably, Plaintiff did not file a reply memorandum in further support of its motion, and the Court will permit Defendant to cure the matter through supplementation.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Exclude the Testimony of John Lavin (Doc. 36) is **denied**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude the Testimony of John Karnes (Doc. 38) is **denied in part and granted in part** as described above.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude the Testimony of Charles Powell (Doc. 40) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 44) is **denied**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Partial Summary Judgment (Doc. 74) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike (Doc. 83) is **denied**, and Defendant is permitted to supplement its citations as explained in the Memorandum.

**IT IS FINALLY ORDERED** that the matter is set for a status conference via telephone with counsel only on **Monday, July 19, 2021 at 11:30 a.m.** Chambers will initiate the conference call.

So ordered this 2nd day of July, 2021.

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE